JAMES B. BELTZER AND BERNICE BELTZER, HUSBAND AND WIFE, APPELLANTS, V. WILLEFORD FARMS, INC., A NEBRASKA CORPORATION, AND N & W, INC., A NEBRASKA CORPORATION, APPELLEES.

337 N.W.2d 406

Filed August 5, 1983. No. 82-404.

Thomas H. Delay of Mueting, Delay & Stoffer, for appellants.

Brogan & Stafford, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

HASTINGS, J.

This appeal involves the sale of certain parcels of land located in Pierce and Antelope Counties, Nebraska, by the defendants to the plaintiffs. At the end of the introduction of evidence by plaintiffs, the defendants moved that a verdict be directed in their favor. The court granted this motion and dismissed plaintiffs' petition.

On appeal the plaintiffs assign three errors to this ruling by the trial court. They are: (1) The court erred in its application of the doctrine of merger, because it is an affirmative defense which was not pleaded by the defendants; (2) The court erred in finding that fraud was not shown by plaintiffs' evidence; and (3) The court erred in directing the verdict in this case because a question of fact on a material issue remained for determination by the jury. As will become more clear hereafter, we only need to consider the last assignment of error.

A brief summary of the relevant facts will aid in the understanding of this decision. On November 2, 1978, the defendants listed 10 quarter sections of land located in Pierce and Antelope Counties for sale with the Thor real estate agency.

William Willeford was the president of Willeford Farms, Inc., and vice president of N & W, Inc., both family-dominated corporations which owned the land offered for sale. He testified that he gave Thor specific information about the land, particularly concerning the irrigation wells and pumps. This information included statements that the wells on quarter sections Nos. 2, 5, and 6 had a pumping capacity of 900 gallons per minute. He also said that he had stated to the listing agent that the 10 quarter sections contained 1,260 acres of irrigated land.

Willeford admitted that such information was given to the agent because he thought it would be of interest to anyone who might be considering a purchase of the land. He agreed that the productivity of a farm is important to a prospective buyer and that there was a definite difference in the ability of an irrigated farm to produce crops as opposed to a dryland farm.

This same witness also admitted that he never again test pumped the wells after their initial installation in 1974 and that, as a matter of fact, in 1974 he had registered these wells with the State of Nebraska and represented that the well on quarter section No. 2 had an 800-gallon-per-minute capacity, No. 5, 900 gallons per minute, and No. 6, 700 gallons per minute.

John Thor of the Thor real estate agency testified that he made up a sales brochure from the information given to him by Mr. Willeford, a copy of which he assumed he had sent to James Beltzer. Thor agreed that he had relied on the information given him by Willeford in making up his sales brochure and in composing his advertising.

Mr. Beltzer testified that he did in fact receive a copy of the sales brochure which contained information regarding the number of acres under irrigation and the capacity of the wells; that he believed that information; and that he relied on it in making his decision to purchase the property.

Following certain negotiations, a contract was entered into between the parties whereby Beltzer agreed to buy the 10 quarter sections for a total price of $1,564,000. That agreement related to title, possession, and total quantity of land to be sold, and no reference was made as to the number of acres which were irrigated or the pumping capacity of the various wells.

On January 17, 1979, two additional agreements were drafted and signed, which superseded the original agreement, in effect making the transaction an exchange involving certain land owned by Beltzer located in Hall County, Nebraska. The Hall County land was to be deeded to the defendants as a major part of the consideration for the transfer of the 10 quarter sections. Again, these later agreements made no reference to the quantity of irrigated land or the capacity of the wells. Deeds conveying the 10 quarter sections were delivered to Beltzer on March 5, 1979, which deeds contained only the description of the 10 quarters and the usual covenants of warranty.

According to the further testimony of Mr. Beltzer, he became aware of troubles with the irrigation systems in the spring of 1980. He was earlier aware of the possibility of a discrepancy in the number of acres actually under irrigation.

The testimony in the record is undisputed that as of the spring of 1978 the number of acres under irrigation, by actual measurement, was 1,209.02 and that as of December of 1978 the pumping capacity of the well on quarter section No. 2 was 650 gallons per minute, No. 5, 750 gallons per minute, and No. 6, 650 gallons per minute. Although this specific information was not obtained by Mr. Beltzer until shortly before the trial of this action in April of 1982, he apparently did have reason to believe there were deficiencies in the land which he had purchased much earlier, and he had discussed this matter with Mr. Willeford in the fall of 1980.

Not having come to a satisfactory resolution of the

problem, on May 4, 1981, the Beltzers filed a petition claiming that the oral representations and warranties made by the defendants and relied upon by the Beltzers in entering into the written contracts were false and misleading. They sought as damages the difference between the value of the premises as represented and the actual value of the land conveyed. In their amended answer the defendants generally denied the claims of the plaintiffs, and denied any firm representations of irrigated acreage or pumping capacities of the wells. Nowhere did the defendants raise the doctrine of merger in their answer.

At the close of the plaintiffs' evidence the defendants moved for a directed verdict in their favor. The court made the following ruling: "I am of the opinion that there has been no fraud shown. This was a sale of land engross [sic] for a fixed sum. I am of the opinion that the doctrine of merger applies. I am of the opinion that the plaintiff has failed to make out a case, that the defendant or both defendants are entitled to a directed verdict, and a dismissal of plaintiff's petition at plaintiff's cost and it will be so ordered. I will direct such a verdict immediately after lunch when the jury returns. I base that on the doctrine of merger." The court thereafter directed a verdict in favor of the defendants.

Stated simply, the rule or doctrine of merger is that upon the delivery and acceptance of an unambiguous deed, all prior negotiations and agreements are deemed merged therein. *Bibow v. Gerrard*, 209 Neb. 10, 306 N.W.2d 148 (1981). The rule is equally applicable where prior oral negotiations result in a written contract. 17 Am. Jur. 2d *Contracts* § 260 (1964). However, the presence of fraud or mistake of fact is a recognized exception to the general rule that prior negotiations and agreements are merged into the final written contract of sale or deed. *Ludwig v. Matter*, 210 Neb. 87, 313 N.W.2d 234 (1981). At the very least, the record raises a reasonable

question as to whether a mistake of fact existed which should have been submitted to the jury.

The judgment of the District Court is reversed and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.